EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

MELISSA CASTALDI,

    Plaintiff,       MEMORANDUM
               AND ORDER
               06-CV-1008 (JG) (KAM)

    -against-

LAND ROVER NORTH AMERICA, INC.
and LAND ROVER,

      Defendants.
-----------------------------------------------------------x
A P P E A R A N C E S :

   SANDERS, SANDERS, BLOCK, WOYCIK, VIENER & GROSSMAN, P.C.
     100 Herricks Road
     Mineola, NY 11501
   By: Larry I. Badash
     Attorneys for Plaintiff

   AARONSON, RAPPAPORT, FEINSTEIN & DEUTSCH, LLP
     757 Third Avenue
     New York, NY 10017
   By: Peter J. Fazio
     Robert J. Cecala
     Attorneys for Defendants

JOHN GLEESON, United States District Judge:

   Melissa Castaldi sues Land Rover North America, Inc. and Land Rover (collectively "Land Rover") in this tort action, which is before me pursuant to the Court's diversity jurisdiction. While Castaldi was working as a receptionist in a Land Rover dealership, a vehicle being moved on the showroom floor sprang forward and struck her desk, pushing Castaldi and her chair through the plaster wall. Castaldi alleges that a defective brake light switch and brake shift interlock system allowed the car to shift into drive mode without the brake

1

being engaged, causing the car to accelerate rapidly and strike her before the employee moving the car could react. She alleges that Land Rover is strictly liable for a defectively designed product; liable for marketing a product with a manufacturing defect; and liable for breach of warranty. Land Rover moves for summary judgment and to preclude three of Castaldi's proposed witnesses from giving expert testimony. For the reasons set forth below, the motions to preclude are granted and the motion for summary judgment is denied.

BACKGROUND

On August 30, 2004, Melissa Castaldi was working as a receptionist in a showroom of the car dealership Manhattan Automobile Company, located at 787 11th Avenue in Manhattan. It is undisputed that Jeremiah O'Leary, a 64-year-old employee of the dealership, was attempting to move a 2004 Land Rover Discovery Series II vehicle located on the showroom floor when the car accelerated sharply and struck Castaldi's desk, propelling the desk into Castaldi and Castaldi and her chair partly through the plaster wall behind her.

The circumstances of the accident are disputed. A police accident report made on August 30, 2004 records that O'Leary stated that when he put the car in drive, it "jumped into gear and progressed forward and struck the victim and pushed her and the vehicle through the wall." Pl.'s Mem. Opp. Summ. J. Ex. C. O'Leary claims, in signed statements made on September 1, 2004 and September 28, 2004, that he put his foot firmly on the brake while switching from Park to Drive, that as soon as he lifted his foot from the brake the vehicle sprang forward sharply, and that he immediately braked with all his strength but could not prevent the vehicle from striking Castaldi's desk. Def.'s Mem. Supp. Summ. J. Ex. C. O'Leary died several months after the incident and was never deposed.

2

Three dealership employees provided roughly similar versions of the incident. Richard Capetta and Jeff Drajin, who were in an adjacent room, testified at their depositions that they heard a loud engine roar (which Capetta described as consistent with someone pressing the accelerator to the floor) and then a collision. Capetta Dep. 17, 25-26; Drajin Dep. 11-12. Capetta also reports the sound of tires screeching after the engine roar began and before the collision. Capetta Dep. 17. Ted Houvouras, who was seated at a desk in the showroom, claimed in a written statement that he saw O'Leary driving the vehicle at a typical showroom speed in his peripheral vision when the car suddenly "revved strongly" and veered into Castaldi's desk. Def.'s Mem. Supp. Summ. J. Ex. G. 1.

Howard Bristow, a mechanic retained by the dealership's property insurer, and Richard Pederson, an engineer retained by the dealership's liability insurer, examined the vehicle on September 16, 2004. Bristow Dep. 12; Pederson Dep. 13-14. They both noted that the brake lights were illuminated while nobody was in the vehicle and that the vehicle could be switched from park mode to drive mode without pressing the brake pedal. Bristow Dep. 15-17; Pederson Dep. 25, 32. This is irregular, because ordinarily the brake lights will illuminate only when the brake is engaged and the brake shift interlock system will allow the car to switch modes only while the brake is engaged. Bristow Dep. 17; Pederson Dep. 31-32.

Bristow and Pederson inspected the vehicle again on October 5, 2004 in the presence of a Land Rover representative, where they noted the same irregularity. Bristow Dep. 21; Pederson Dep. 38. They inspected the vehicle further and found a problem with the brake light switch, which activates the brake lights and the brake shift interlock. Bristow claims that the brake light switch was visibly misaligned, allowing the brake light to be on and the brake

shift interlock to be deactivated without the brake engaged.  Bristow Dep. 22-25.  He also claims that by experimenting with an exemplar vehicle's brake light switch, he was able to misalign it by applying minimal pressure with his finger, due to the brake light switch being affixed only with a plastic peg.  Bristow Dep. 25.  Bristow opines that the risk of misalignment would be eliminated by mounting the brake light switch with a threaded stud and nut instead of a plastic peg.  *Id.* at 25-26.  Pederson did not state that the brake light switch was visibly misaligned, but stated that the brake light switch could be pulled rearward approximately 20 to 30 thousandths of an inch, which turned off the brake light, indicating an "overly sensitive mechanism."  Pederson Dep. 39.  Pederson claims that experimenting with an exemplar light switch revealed that movement of only approximately 30 thousandths of an inch would activate the switch.  *Id.* at 40.

Three days prior to the accident, the dealership had performed a predelivery inspection which revealed no problems with the brake shift interlock.  Def.'s Mem. Supp. Summ. J. Ex. A; Bianco Dep. 23-25.  Four days after the accident and prior to Bristow's and Pederson's investigations, Jeff Nicholson, a Land Rover technician, inspected the vehicle and found no problem with the brake lights or the brake shift interlock.  Nicholson Dep. 32-34.  In 2005, the National Highway Traffic Safety Administration ("NHTSA") opened an investigation into brake light switch failures in 2004 Land Rover Discovery Series II vehicles, concluding that a defective plastic component inside the switch could cause the switch's plunger to move too freely along its axis, leading to brake lights that are constantly illuminated.  Badash Letter, Nov. 16, 2007, at 2-3.  According to the report, approximately 31% of the warranty claims paid to replace the brake lights switches in these vehicles occurred "before the vehicle was sold new, and approximately 88% occurred within the first 12 months of vehicle service."  *Id.* at 4.

Castaldi filed suit in the New York Supreme Court in Queens County on January 11, 2006. Land Rover filed a notice of removal on February 16, 2006 based on the Court's diversity jurisdiction.[1] Castaldi retained Luka Serdar, an engineer, as an expert. Serdar opined that the vehicle's brake light switch was defective, thus rendering the brake shift interlock inoperative and allowing the vehicle to be switched from park to drive without enough pressure on the brake pedal to engage the brakes. He based this conclusion on the reports that the vehicle had accelerated unexpectedly toward Castaldi; Bristow's investigation report; his own test of the vehicle conducted on November 6, 2006, where he observed that the vehicle's replacement brake light switch was not functioning properly; the NHTSA investigation report; and his test of an exemplar vehicle where he found that light pressure on the brake pedal would enable the vehicle to be shifted from park to drive without sufficient brake pressure to slow the vehicle. Pl.'s Mem. Opp. Summ. J. Ex. H. He disregarded O'Leary's statement that he had his foot firmly on the brake when he switched from park to drive, claiming that if this was the case, the car would not have moved. Serdar Dep. 263-64.

While Serdar is currently Castaldi's only expert witness, Castaldi deposed Bristow and Pederson as non-party witnesses, and she now intends to call them at trial and have them testify as experts. Serdar and Pederson did not express any opinion on a feasible alternative design. Serdar Dep. 288-89. Bristow opined that mounting the brake light switch with a threaded stud and nut would be a feasible alternative design which would eliminate the problem. Bristow Dep. 25-26. At his deposition, Bristow did not know if the stud and nut should be mounted parallel to the brake light switch's plunger or perpendicular to it. *Id.* at 132-

---

[1] Castaldi filed a second complaint in this Court on November 14, 2006, naming Land Rover and Land Rover, U.K. as defendants but alleging the same causes of action. Land Rover, U.K. was subsequently dropped as a defendant.

33. Bristow believed that the light switch would either function properly or not at all, but would not malfunction intermittently. *Id.* at 121-22. Pederson and Serdar opined that the switch could function intermittently and could be knocked into or out of alignment by moving the vehicle around the dealership. Pederson Dep. 35-36, 43; Serdar Dep. 281-82.

DISCUSSION

A. *Summary Judgment Standard*

Under Federal Rule of Civil Procedure 56(c), a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994) ("[T]he burden is on the moving party to demonstrate that no genuine issue respecting any material fact exists." (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975))). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586. Summary judgment is proper when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223-24 (citations omitted).

B.      *Pederson and Bristow as Experts*

Land Rover seeks to preclude Pederson and Bristow from offering expert opinion testimony, arguing that two provisions of the Federal Rules of Civil Procedure prevent them from being called as experts. First, Land Rover argues that Rule 45(c)(3)(B)(ii), providing for certain motions to quash subpoenas, was circumvented by the manner in which Pederson and Bristow were deposed. Second, Land Rover claims that Castaldi never disclosed Pederson and Bristow's identities as experts as required by Rule 26(a)(2)(A) and never submitted expert reports for either witness as required by Rule 26(a)(2)(B).

Castaldi subpoenaed Pederson and Bristow as non-party witnesses. Rule 45(c)(3)(B)(ii) provides that a court may quash a subpoena if it "requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study not made at the request of any party." Land Rover claims that Castaldi circumvented any opportunity to quash the subpoena under Rule 45(c)(3)(B)(ii) by subpoenaing Pederson and Bristow only as non-party witnesses, not as

unretained experts, and then by proceeding to question them about their opinions as if they were experts. Def's Reply Mem. Supp. Summ. J. 3-4.

Land Rover, however, misreads Rule 45(c)(3)(B)(ii), which functions to protect the subject of the subpoena, not the adverse party in the case. Rule 45(c) is titled "Protection of Persons Subject to Subpoenas," and the court's power to quash or modify the subpoena is available "to protect a person subject to or affected by the subpoena," Fed. R. Civ. P. 45(c)(3)(B)(iii). Further, the Advisory Committee Notes to the amendment enacting Rule 45(c)(3)(B)(ii) make clear that the purpose of the provision is to protect the intellectual property of the subpoenaed expert, not the rights of the adverse party.[2] Accordingly, any circumvention of Rule 45(c)(3)(B)(ii) was an issue for Pederson or Bristow to raise; it has no bearing on whether they are properly qualified to give opinion testimony.

Land Rover's other objection to the qualification of Pederson and Bristow as experts is stronger. Federal Rule of Civil Procedure 26(a)(2)(A) requires parties to disclose the identities of all those they intend to call as expert witnesses, and Rule 27(a)(2)(B) requires them to provide a written report prepared and signed by each expert witness. This report must contain:

> [A] complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the

---

[2]     Fed. R. Civ. P. 45 advisory committee's note (1991 Amendment, Subdivision (c)) ("Clause (c)(3)(B)(ii) provides appropriate protection for the intellectual property of the non-party witness . . . . Experts are not exempt from the duty to give evidence, even if they cannot be compelled to prepare themselves to give effective testimony . . . , but compulsion to give evidence may threaten the intellectual property of experts denied the opportunity to bargain for the value of their services." (citations omitted)); *see also, e.g.*, *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 814 (9th Cir. 2003) (noting that the purpose of Rule 45(c)(3)(B)(ii) is to protect witnesses' intellectual property); *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Penn.*, 148 F.R.D. 552, 557-58 & n.13 (S.D. W. Va. 1993) (construing the purpose of the rule to be protecting witnesses' intellectual property and declining to apply the rule when, inter alia, the witness had already been paid for forming opinions).

> study or testimony; and a listing of any other cases in which the
> witness has testified as an expert at trial or by deposition within the
> preceding four years.

Fed. R. Civ. P. 26(a)(2)(B).  Rule 37(c) provides that failure to make a disclosure required by

Rule 26(a), or to supplement or amend a prior disclosure under Rule 26(e), precludes the use of

the information not disclosed as evidence unless there was "substantial justification" for failing

to disclose or the failure was "harmless."

      While both Bristow and Pederson prepared investigation reports, and Castaldi has

supplied the resumes of the two witnesses, Castaldi has not satisfied her disclosure duties under

Rule 26(a)(2).  Neither report contains a statement of the compensation paid for the

investigation, though this particular defect might be harmless considering the ease of eliciting

such information.  While each investigation report outlines the investigative steps taken and

attaches several reference materials such as the car's user manual, neither contains any list of all

the "data or other information considered by the witness in forming the opinions," as required by

Rule 26(a)(2).  Even if no other reference works were considered, the investigation reports suffer

from a more fundamental deficiency:  They do not disclose key opinions that Castaldi seeks to

elicit from Bristow and Pederson as experts.  Bristow's investigation report does not disclose his

opinion regarding the existence and specifications of a feasible alternative design, and

Pederson's report does not disclose his opinion that the defect could manifest intermittently.  To

the extent that Castaldi offers their expert opinions on these issues, she has failed to produce

reports as required by Rule 26(a)(2).

      It is not surprising that the investigation reports do not satisfy the Rule 26

standards, as they are not Rule 26 reports.  What is surprising is that Castaldi has not in a timely

fashion prepared adequate Rule 26 reports for Pederson and Bristow. The failure to disclose Bristow and Pederson's opinions in a report is not harmless, as it deprives the defendants of the benefit of written explanations and justifications of these key pieces of opinion testimony. This is so even though Bristow and Pederson were deposed regarding these questions. *See LaMarca v. United States*, 31 F. Supp. 2d 110, 123 (E.D.N.Y. 1998) ("[D]eposition testimony does not cure deficiencies in the [Rule] 26(a)(2)(B) notice." (quoting *Kolt v. United States*, No. 94-CV-0293E(H), 1998 WL 214826, at *3 (W.D.N.Y. Apr. 24, 1998))). Nor has Castaldi shown that this failure to disclose is substantially justified. *See, e.g.*, *Arnold v. Krause, Inc.*, 232 F.R.D. 58, 68-69 (W.D.N.Y. 2004) (precluding expert testimony based on unexcused delay in submitting expert report).[3]

Accordingly, Bristow and Pederson will not be permitted to offer expert testimony. However, Land Rover has offered no reason why they should not be permitted to testify as to the observations they made in the course of the inspections they conducted, and as to any opinions rationally based their perceptions and not based on scientific, technical or specialized knowledge. *See* Fed. R. Evid. 701 (permitting a non-expert witness to testify to opinions which are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based

---

[3]     Several district courts in this Circuit have considered preclusion of a witness to be a "drastic remedy" to be applied only where the "party's conduct represents flagrant bad faith and callous disregard for the federal rules." *E.g.*, *Arnold*, 232 F.R.D. at 68 (quoting *McNerny v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 587 (W.D.N.Y. 1995)); *accord, e.g.*, *Palma v. Pharmedica Commc'ns, Inc.*, No. 00-CV-1128(AHN), 2002 WL 32093275, at *3 (D. Conn. 2002). While Castaldi has made no apparent attempt to comply with Rule 26(a)(2) regarding Bristow and Pederson, I need not go so far as to deem her conduct to be "flagrant bad faith." As described *infra*, considering that Bristow and Pederson will still be able to testify as fact witnesses, and considering that their testimony will be able to embrace aspects of what Castaldi wished them to discuss as experts, the effect of my ruling is not nearly as drastic as in the vast run of cases where district courts consider precluding expert witnesses based on Rule 26.

on scientific, technical, or other specialized knowledge within the scope of Rule 702 [regarding expert witnesses]").

C.      *Serdar's Qualification as an Expert*

The defendants move to preclude Serdar from testifying as to his opinion that a defective brake light switch allowed the vehicle to be shifted from park to drive without enough brake pressure to prevent the vehicle from moving; that this defect caused the crash; and that O'Leary did not have sufficient time and distance to avoid the collision.  They claim that Serdar's testimony is inadmissible speculation and does not satisfy the requirements of Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles or methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court has interpreted the Federal Rules of Evidence to "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (applying *Daubert* to non-scientific expert testimony).

To assess whether an expert's testimony is sufficiently reliable, courts undertake a "'flexible'" inquiry.  *Zaremba v. Gen'l Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) (quoting *Kumho Tire*, 526 U.S. at 141).  This may involve consideration of "(1) whether a theory or technique can be and has been tested, (2) whether it has been subjected to peer review and

publication, (3) whether it has a known or potential rate of error, and (4) whether it is generally accepted in the relevant scientific community." *Kumho Tire*, 526 U.S. at 149-50 (citing *Daubert*, 509 U.S. at 592-94). These factors, however, are only to be employed "'where they are reasonable measures of the reliability of expert testimony.'" *Zaremba*, 360 F.3d at 358 (quoting *Kumho Tire*, 526 U.S. at 152).

Serdar's testimony regarding whether O'Leary had time to avoid the accident is unreliable. It is questionable whether he is even qualified as an expert in the human factors involved in accidents. Though he has he never received any formal training in the field of human factors and admits he is not an expert on human factors generally, Serdar Dep. 147, Serdar holds himself out as an expert in the subspecialty of human factors concerning driver actions. He claims his expertise was acquired largely informally, by teaching driving courses for teenagers and observing their actions. *Id.* at 147-50. Mindful that the Second Circuit has "construed expert qualification requirements liberally," *Canino v. HRP, Inc.*, 105 F. Supp. 2d 21, 27 (N.D.N.Y. 2000) (quoting *Zwillinger v. Garfield Slope Housing Corp.*, No. CV 94-4009(SMG), 1998 WL 623589, at *9 (E.D.N.Y. Aug. 17, 1998)), and that human factors is itself a fairly narrow specialty within the field of vehicle accident reconstruction, I might not exclude Serdar's testimony on this ground alone. *See Canino*, 105 F. Supp. 2d at 27 ("[A]ssuming that the proffered expert has the requisite minimal education and experience in a relevant field . . . , courts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of the dispute in the lawsuit." (citing *Zwillinger*, 1998 WL 623589, at *7-*8)).

However, even if Serdar is qualified to assess driver actions, his reconstruction of O'Leary's reaction time is not reliable. His calculation of O'Leary's perception-reaction time as 1.5 seconds relied solely on an article that actually supported a considerably lower perception-reaction time. Def.'s Mem. Supp. Summ. J. Ex. K 64-8 to 64-9. When confronted with this disparity, Serdar switched horses; he claimed reliance on a study cited within the article he relied on. This study, which Serdar did not list as reliance material on his Rule 26(a)(2) report, provided a figure of 2.5 seconds, which is not the figure Serdar uses. In addition, the article Serdar did cite criticized the study, which in any event involved driving scenarios not present here. Serdar Dep. 359-75.

Serdar's calculation of the elapsed time before the vehicle struck Castaldi's desk is also unreliable. In his first report, he estimated the time of the accident based on the vehicle traveling 10 feet. After receiving an accident scene diagram showing that the vehicle was 19 feet away from Castaldi's desk, Serdar performed new calculations which he did not include in his supplemental report but instead threw away. Serdar Dep. 242-48. He did not include his revised conclusion in his supplemental report either, mentioning it only under questioning at his deposition. *Id.* at 244-48, 255-56. He also did not explain the figure he uses for the acceleration of the vehicle in his reconstruction of the accident, stating that his calculations provide the timing of the accident if the vehicle was accelerating at full throttle but not explaining why he considers the vehicle to have been accelerating at full throttle. *Id.* at 352-58. In his deposition, he stated that he later revised his estimate of the vehicle's acceleration, but the only records of this are calculations that he threw away. *Id.* at 252-55. Combined with his failure to produce his calculations for verification and the lack of support he provided in calculating O'Leary's

perception-reaction time, Serdar's opinions regarding the timing of the accident and O'Leary's reaction time are inadmissible speculation.

Land Rover also seeks to preclude Serdar's expert opinion that a defect in the vehicle's brake light switch caused the accident. Land Rover claims that Serdar has disregarded O'Leary's statements that he placed his foot on the brake and that Serdar has no basis for his assumption that a defect caused the forward movement of the vehicle. Serdar's testimony that a defect in the vehicle caused its forward movement is indeed inadmissible, but not for the reason Land Rover asserts. Serdar did have evidence that a defective brake light switch deactivated the brake shift interlock on the vehicle: the investigation results of Bristow and Pederson; the NHTSA investigation reports; witness statements, including O'Leary's first statement, indicating that the vehicle jumped forward at a high rate of speed; and Serdar's own observation that the vehicle exhibited the same defect even with a new brake light switch installed.[4] Although there was some contrary evidence -- the pre-delivery inspection, Land Rover's post-accident inspection, and O'Leary's later statements indicating that he had his foot firmly on the brake while switching from park to drive -- Serdar was not without a basis for concluding that the brake light switch allowed the vehicle to shift from park to drive unexpectedly, and that this caused the impact with Castaldi's desk.

The problem with Serdar testifying to this conclusion is that he did not use any expertise to reach it. Apart from his unreliable accident reconstruction, Serdar did not appear to use any testable methodology at all. He simply performed the function of a juror. Accordingly, he is precluded from offering his expert opinion in connection with this matter.

---

[4]    Serdar also tested an exemplar vehicle and did not find the same defect as Bristow and Pederson had in the subject vehicle, but did find that he could deactivate the brake shift interlock with very light pressure on the brake pedal.

D.    *Appropriateness of Summary Judgment*

1.    *Strict Liability for Design Defect*

One of Castaldi's theories -- essentially the only one the parties have addressed in their submissions[5] -- is that Land Rover should be held strictly liable for a defectively designed product.  Under New York law, a plaintiff can make out a prima facie case for strict liability based on defective product design if she can show that the manufacturer "marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing [her] injury."  *E.g.*, *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 132 (2d Cir. 1999) (quoting *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 107 (1983)).  *Voss*, setting forth the modern strict liability standard, defined a product that is "not reasonably safe" as being "a product which, if the design defect at the time were known at the time of manufacture, a reasonable person would conclude that the utility of the product does not outweigh the risk inherent in marketing a product designed in that manner."   59 N.Y.2d at 108.  To determine what a reasonable person would conclude, *Voss* specified the following factors:

> (1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product -- that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have avoided injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which can reasonably be attributed to the plaintiff; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design.

*Id.* at 109 (citation omitted); *accord Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 257 (1995) (quoting *Voss*).

---

[5]    *See* Section D.2, *infra*.

In addition to describing the above seven-factor inquiry, *Voss* noted that a plaintiff would have to prove that a product was "not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner." 59 N.Y.2d at 108. Using this as a formulation of "not reasonably safe" in conjunction with *Voss*'s requirement that a product cause the plaintiff's injury, *id.* at 109-10, courts in New York consider a claim for strict product liability based on defective design to require proof that (1) the product as designed posed a substantial likelihood of harm, (2) it was feasible to design the product in a safer manner, and (3) the defective design was a substantial factor in causing the plaintiff's injury. *E.g.*, *Galetta v. Valmet, Inc.*, No. 04-CV-0313, 2007 WL 963288, at *4 (N.D.N.Y. Mar. 30, 2007) (citing *G.E. Capital Corp. v. A.O. Smith Corp.*, No. 01 Civ. 1849 LAP, 2003 WL 21498901, at *4 (S.D.N.Y. July 1, 2003)).

Land Rover argues that Castaldi has failed to provide sufficient evidence to enable a reasonable jury to conclude that she has made a prima facie case for strict liability based on a design defect. First, it claims that *Speller ex rel. Miller v. Sears, Roebuck & Co.* requires her to prove that the incident which harmed her "a) was of a kind that ordinarily occurs as a result of a product defect; and b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution." 100 N.Y.2d 38, 42 (2003) (quoting *Restatement (Third) of Torts: Prods. Liab.* § 3 (1998)). Arguing that Castaldi cannot exclude all other causes of their injury, Land Rover concludes that she cannot prove a prima facie case. This argument, however, founders on the fact that *Speller* sets out the requirements for a prima facie case when the plaintiff cannot identify any specific defect. *See* 100 N.Y.2d at 41 ("In order to proceed *in the absence of evidence identifying a specific flaw*, a plaintiff must

16

prove that the product did not perform as intended and exclude all other causes for the product's failure that are not attributable to the defendants." (emphasis added)). Castaldi provides Bristow and Pederson's testimony as evidence identifying a specific flaw -- a misaligned brake light switch deactivating the brake shift interlock. Thus, *Speller* is inapplicable.

Land Rover's second argument is that with Bristow precluded from offering expert testimony, Castaldi cannot establish the existence of the feasible alternative design required under New York law. This is a more powerful objection, but it is still insufficient to warrant summary judgment in this case. It is true that defendants have won summary judgment by excluding expert testimony tending to prove the existence of a feasible alternative design. *See, e.g.*, *Zaremba*, 360 F.3d at 358-60 (affirming grant of summary judgment based on exclusion of expert testimony regarding feasible alternative design of car frame); *Kass v. West Bend Co.*, No. 02-CV-3719(NGG), 2004 WL 2475606, at *10, *12 (E.D.N.Y. Nov. 4, 2004) (excluding expert testimony regarding feasible alternative design of coffee pot and granting summary judgment). The reason that motions for summary judgment were granted in such cases, however, was not simply that the plaintiff produced no admissible *expert* testimony to support the existence of a feasible alternative design. Rather, it was because those cases were of such a nature that in the absence of expert testimony, there was insufficient evidence for a reasonable jury to find the existence of a feasible alternative design. *See, e.g.*, *Kass*, 2004 WL 2475606, at *12 ("[P]laintiffs proffered expert evidence is excluded because it does not meet the requirements of Federal Rule of Evidence 702. Plaintiffs offer no additional evidence to assert that an alternative coffee maker design exists that is both practical and feasible.").

17

It is not necessary that any particular element of a prima facie case be proved by expert testimony, only that each element be proved by admissible evidence. In cases where lay testimony is sufficient to allow a reasonable jury to find that the elements of a product defect have been set forth, courts have allowed plaintiffs to proceed even without any expert testimony. *See Faryniarz v. Nike, Inc.* (*Faryniarz I*), No. 00 Civ. 2632(NRB), 2002 WL 530997, at *2 (S.D.N.Y. Apr. 8, 2002) (allowing plaintiff to prove a prima facie case of product liability without expert testimony regarding causation when the claim was that sneakers were defectively designed so that their laces would catch on their pull-tabs); *see also Buckley v. Gen'l Motors Corp.*, No. 98 Civ. 4366(BSJ), 2004 WL 725933, at *3 (S.D.N.Y. Apr. 2, 2004) ("A plaintiff need not introduce expert testimony to establish that a vehicle should neither veer nor lean to one direction if the driver is not steering in that direction, that a vehicle should slow down when the brake is applied, and that a vehicle should not roll over under normal driving conditions; such a conclusion is within the common knowledge of the jury.").

The cases in which courts have allowed plaintiffs to proceed without expert testimony have generally considered only causation, but their reasoning applies equally to the existence of a feasible alternative design. *Cf. Clarke v. LR Systems*, 219 F. Supp. 2d 323, 331 (E.D.N.Y. 2002) (noting in dicta that defendant's argument that summary judgment would be required if expert's testimony is excluded "is not entirely sound" due to possibility of non-expert testimony at least regarding causation). Just as conclusions regarding causation may be "within the common knowledge of the jury" in certain cases, *Buckley*, 2004 WL 725933, at *3, so might the presence of feasible alternative designs, when those designs are not speculative or hypothetical but present and ubiquitous in the marketplace. It is settled that expert testimony

identifying "similar equipment using an alternative design that has been put into use by other makers" can suffice to show a feasible alternative design. *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 80 (2d Cir. 2006) (citing *Rypkema v. Time Mfg. Co.*, 263 F. Supp. 2d 687, 692 (S.D.N.Y. 2003)). Assuming the actual use of an alternative design in similar products can be proven by other admissible evidence, there is no reason that this mode of proof need be restricted to expert testimony.

In *Faryniarz*, the plaintiff's expert was precluded from offering expert testimony regarding whether the plaintiff's accident was caused by the long shoelaces and stiff pull-tabs of the plaintiff's running shoes due to the unreliability of his methods. *Faryniarz v. Nike, Inc.* (*Faryniarz II*), No. 00 Civ. 2623(NRB), 2002 WL 1968351, at *3 (S.D.N.Y. Aug. 23, 2002). The court, however, allowed the expert to testify to "the presence of various lacing schemes and pull-tab placements in different shoe models." *Id.* at *4. The court noted that this testimony was "not scientific and could potentially be offered by a shoe salesman," *id.*, but allowed the plaintiff to go to trial with this testimony regarding the presence of alternative designs.

In this case, Castaldi has sufficient admissible non-expert evidence to suggest that brake shift interlock systems generally work to prevent vehicles from switching from park to drive unless the brake is engaged. While the fact may not be quite so commonly known as to be judicially noticeable, *cf.* Fed. R. Evid. 201(b)(1) (authorizing judicial notice for facts "generally known within the territorial jurisdiction of the trial court"), any of the plaintiff's witnesses who have driven a car with automatic transmission can testify to the functioning of brake shift interlocks based on their personal knowledge. Additionally, the NHTSA report, admissible as a government record, Fed. R. Evid. 803(8)(C), indicates that intermittent functioning of the brake

shift interlock was sufficiently unusual as to warrant an investigation and also suggesting that the defect did not occur until Land Rover switched manufacturers for a component of the brake light switch. Taken together, this is sufficient to enable a reasonable jury to find that it is feasible to design a functional brake shift interlock system. Therefore, summary judgment is denied on Castaldi's claim of strict liability for a design defect.

2. *Manufacturing Defect*

Castaldi's response in opposition to Land Rover's motion for summary judgment briefly mentions a theory of negligent manufacture resulting in a manufacturing defect.[6] Additionally, her complaint for strict liability uses sufficiently general language to encompass a claim for strict liability based on a manufacturing defect. Land Rover does not even mention this

---

[6]     Castaldi makes two mentions of her manufacturing defect claim in connection with this motion. Both are reprinted in their entirety:

> In this lawsuit, plaintiff proceeds on both a defective design theory and a negligent theory. [sic]  Support for plaintiff's negligent theory [sic] (i.e., negligent installation of the mounting of the stop light switch and its mounting) as well as her design theory (faulty design of the brake light switch and its mounting) is derived from the opinions expressed by Serdar, Bristow, and Pederson.

Pl.'s Mem. Opp. Summ. J. 5.

> B. Negligence Theory
>
> Under a negligence theory, it is hornbook law that plaintiff must establish (1) the existence of a duty; (2) a breach of that duty; (3) foreseeability of injury; and (4) proximate cause.
> The opinions contained in the reports and deposition testimony of Serdar, Bristow and Pederson as well as those contained in the medical reports of plaintiff's treating physicians, clearly support that plaintiff has met her burden of proof as to the above-described elements.

Pl.'s Mem. Opp. Summ. J. 9.

theory in its memorandum in support of its motion or in its reply, but this neglect is excused by the cursory treatment of this claim in Castaldi's submissions.[7]

Under New York law, "[t]o prove a manufacturing flaw under either negligence or strict liability, a plaintiff must show that the specific product was defective due to 'some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction,' and that the defect was the cause of the plaintiff's injury." *E.g.*, *Toole v. Toshin*, No. 00-CV-821S, 2004 WL 2202580, at *8 (W.D.N.Y. Sep. 29, 2004) (quoting *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 85 (S.D.N.Y. 2001)). A manufacturing defect exists when the product "deviates in quality and other performance standards" from identical units. *Colon*, 199 F. Supp. 2d at 85 (citing *Perazone v. Sears, Roebuck & Co.*, 515 N.Y.S.2d 908, 911 (App. Div. 1987)).

The standard of fault in manufacturing defect cases is simply strict liability, regardless of whether the claim is characterized as negligence or strict liability. *See, e.g.*, *Colon*, 199 F. Supp. 2d at 86 (describing crux of inquiry as the existence of a defect with no regard to fault); *see also Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 560 n.28 (S.D.N.Y. 2005) ("Negligence is not an element in a manufacturing defect case; where a manufacturing defect causes injury, recovery may be had regardless of whether the manufacturer used reasonable

---

[7]        Indeed, as Land Rover argues, it is not even clear that Castaldi made a claim of negligence in her complaints. *See supra* note 1 and accompanying text (describing first and second complaints). Both complaints include a cause of action for strict liability, a cause of action for breach of warranty, and a cause of action reciting the factual background of the incident and claiming, "Upon information and belief, said Land Rover was a dangerous, defective and harmful product." Compl. ¶ 13; Second Compl. ¶ 26. Castaldi first mentioned negligence in a court filing by noting, in a letter dated  June 19, 2007, that Bristow and Pederson found that the brake light switch was negligently installed.  She first clearly set forth her claim of a negligent manufacturing defect in her response to Land Rover's request for a pre-motion conference, dated July 16, 2007.  Land Rover mentions in its reply brief that Castaldi's complaints do not allege negligence specifically, Defs.' Reply Mem. Supp. Summ. J. 11 n.1, but does not address a theory of strict liability for a manufacturing defect.  As the negligence and strict liability causes of action for manufacturing defect are identical, *see* discussion *infra*, I need not decide whether Castaldi alleges a manufacturing defect due to negligence or merely strict liability for a manufacturing defect.

care." (citing *Caprara v. Chrysler Corp.*, 52 N.Y.2d 114, 123-24 (1981))). The courts that characterize manufacturing defect cases as based on negligence simply cite to authority regarding strict liability manufacturing defect claims, suggesting that the two causes of action are identical. *See, e.g.*, *Ganter v. Makita USA, Inc.*, 737 N.Y.S.2d 184, 185 (App. Div. 2002) (referring to negligence and strict liability manufacturing defect claims and citing to *Caprara* and *Henry v. Gen'l Motors Corp.*, 609 N.Y.S.2d 711, 712 (App. Div. 1994), both of which refer to manufacturing defect claims in the absence of negligence); *McCarthy v. 390 Tower Assocs., LLC*, 800 N.Y.S.2d 875, 881 (Sup. Ct. 2005) (referring to "negligence based manufacturing defect case" and citing to *Caprara* and *Cover v. Cohen*, 61 N.Y.2d 261, 270 (1984), which discuss strict liability).

Here there is sufficient evidence to allow a reasonable jury to find that the vehicle in this case deviated in quality and performance from other identical units, and accordingly the motion for summary judgment on this claim is denied.

3.  *Breach of Warranty*

Neither party has addressed Castaldi's claims for breach of warranty. Under New York law, to make out a case for breach of an implied warranty, "a plaintiff must demonstrate that the product was not fit for the purpose for which it was intended." *E.g.*, *Clarke*, 219 F. Supp. 2d at 331 (citing *Codling v. Paglia*, 32 N.Y.2d 330, 338 (1973)); *see also Denny*, 87 N.Y.2d at 253 (describing jury instruction regarding breach of implied warranty). Although technically a breach of warranty theory is distinct from strict liability or negligence-based design and manufacturing defect theories, "there is 'a high degree of overlap' between them and '[a]s a practical matter, the distinction between the defect concepts in tort law and in implied warranty

theory may have little or no effect in most cases.'" *Clarke*, 219 F. Supp. 2d at 331 (quoting

*Denny*, 87 N.Y.2d at 256, 262).  Due to this similarity between the causes of action, I construe

Land Rover's motion to seek summary judgment on this claim as well.

In light of the foregoing evidence, a reasonable jury could conclude that the

vehicle was not fit for the purpose for which it was intended, and thus the motion for summary

judgment with respect to this claim is denied.

CONCLUSION

For the reasons set forth above, the motion for summary judgment is denied.  The

motions to preclude Bristow, Pederson, and Serdar from testifying as experts are granted.  The

final pretrial conference will be held on January 7, 2008 at 11:30 AM.  Jury selection and trial

will take place on January 14, 2008 at 9:30 AM.

So ordered.

JOHN GLEESON, U.S.D.J.

Dated: Brooklyn, New York
       November 21, 2007